UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

THRESA MAE HERREN,                    )
                                      )
              Plaintiff,              )
                                      )
      v.                              )      No.  1:15 CV 195 JMB
                                      )
CAROLYN W. COLVIN,                    )
Acting Commissioner of Social Security, )
                                      )
              Defendant.              )

## MEMORANDUM AND ORDER

This action is before the Court, pursuant to the Social Security Act ("the Act"), 42 U.S.C.

§§ 401, *et seq*.  The Act authorizes judicial review of the final decision of the Commissioner of

Social Security (the "Commissioner") denying Plaintiff Thresa Mae Herren's application for

Disability Insurance Benefits.  All matters are pending before the undersigned United States

Magistrate Judge with consent of the parties, pursuant to 28 U.S.C. § 636(c).  The matter is fully

briefed, and for the reasons discussed below, the Commissioner's decision is affirmed.

## Procedural History & Summary of Memorandum Decision

On January 31, 2013, Plaintiff filed an application for Disability Insurance Benefits

("DIB") under Title II of the Act.  Plaintiff alleged a disability onset date of September 30, 2011.

(Tr. 16)[1]  Plaintiff's claim was denied initially on March 26, 2013.  (Id.)  Thereafter, Plaintiff

requested a hearing before an Administrative Law Judge ("ALJ"), which was held on April 22,

2014.  Plaintiff and Janice Hastert, an independent Vocational Expert ("VE"), testified at the

hearing.  (Tr. 29)  On May 20, 2014, the ALJ issued a decision concluding that Plaintiff was not

disabled under the Act.  (Tr. 16-25)  The Social Security Administration Appeals Council denied

_____

[1] "Tr." refers to the administrative record filed on behalf of the Commissioner.

Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner in this matter.  (Tr. 1)  Plaintiff filed the instant action on October 28, 2015.  (ECF No. 1)  Accordingly, Plaintiff has exhausted her administrative remedies and the matter is properly before this Court.  Plaintiff has been represented throughout all relevant proceedings.

Although the ultimate issue before the Court is whether substantial evidence supports the Commissioner's decision, Plaintiff's request for judicial review asks the Court to consider two issues, namely:

> (1)     Whether the ALJ erred in resolving alleged inconsistencies among three source opinions, and consequently, whether the ALJ's determination of Plaintiff's Residual Functional Capacity ("RFC") was supported by substantial evidence; and

> (2)     Whether the ALJ erred in assessing Plaintiff's credibility.

After a thorough review of the record, the Court concludes that the Commissioner's decision is supported by substantial evidence.  The differences between the source opinions were adequately explained by the ALJ's decision.  The ALJ's determination of Plaintiff's RFC is supported by the record and the ALJ's decision fairly articulates a basis for that RFC.  The ALJ properly evaluated Plaintiff's credibility and adequately explained the bases for finding Plaintiff's subjective allegations less than fully credible.

## Administrative Record[2]

## I.     General

At the time of her administrative hearing, Plaintiff was 51 years old.  Prior to 2013, Plaintiff had a fairly robust work history, having previously worked as a janitor and machine operator.  (Tr. 178, 221)  Plaintiff represents that she has been disabled since September 30,

---

[2] The undersigned has reviewed and considered the entire administrative record.  Only those portions of the record that are most pertinent to the Court's decision are specifically summarized and discussed herein.

2011, when she injured her knee while "she was going down some stairs with a bucket and …
missed a step." (Tr. 239)

Plaintiff claims she is disabled due to mobility problems, mostly related to problems with
her left knee. Plaintiff also reported left arm numbness and a pinched nerve in her neck. (Tr.
166) According to Plaintiff, her injuries prevent her from standing or sitting for long periods of
time. (Tr. 173) Plaintiff's 2011 knee injury resulted in two knee surgeries—the first in
December 2011 and the second in August 2012. Plaintiff returned to work after each surgery,
but was laid off in 2013. (Tr. 163)

In her Function Report – Adult, Plaintiff listed the following conditions that impact her
ability to work: lifting, squatting, bending, standing, walking, sitting, kneeling, and stair
climbing. (Tr. 199) Plaintiff represented that "stair climbing puts pressure on my knee and it
hurt[s]. I can only lift about 20 pound[s], and squatting, bending, standing, [or] kneeling makes
my knee hurt. Walking about 1 hour makes my knee swell up and I have to ice it down. Sitting
about 1 hour make[s] my knee start hurting [and I] have to raise [my] knee up on pillows and ice
[it] down." (Id.)

## II.     Medical and Opinion Evidence

### A.     Dr. James Edwards, M.D.

As noted above, Plaintiff's principle impairment relates to a left knee injury. Plaintiff's
treating physician for her knee injury was Dr. James Edwards, M.D. Because Dr. Edwards'
treatment of Plaintiff and his opinions regarding her abilities are significant considerations in this
case, the undersigned will summarize Dr. Edwards' treatment records in detail to provide greater
context to the Court's decision.

The record indicates that, although Plaintiff injured her knee on September 30, 2011, her
first visit with Dr. Edwards was on November 7, 2011. (Tr. 239) Plaintiff reported that she

missed a step while she was going down stairs with a bucket. (Id.) Plaintiff had a twist injury, with most of her pain on the medial (inside) part of her left knee, with a little pain in the anterior (front) and posterior (back) portions as well. (Id.) X-ray images of Plaintiff's knee showed "a relatively well aligned joint with no obvious or acute abnormalities," with "[w]ell maintained joint space." (Id.) Dr. Edwards ordered an MRI to rule out a medial meniscal tear, and recommended no squatting or kneeling. (Tr. 240) Dr. Edwards indicated that Plaintiff could return to work, but was limited to no bending, squatting, twisting, or kneeling. (Tr. 279)

Plaintiff had an MRI of her left knee on November 21, 2011 (Tr. 241), and a follow-up visit with Dr. Edwards on November 28, 2011. At the follow-up, Plaintiff complained of pain. Dr. Edwards's clinical impression was a "high suspicion for a medial meniscal tear," and that Plaintiff "[m]ay have a component of lateral patella compression syndrome." (Tr. 242) As a result, on December 15, 2011, Dr. Edwards performed arthroscopic lateral release surgery on Plaintiff's left knee cartilage. (Tr. 237-38, 244) Dr. Edwards indicated that Plaintiff could return to work, but she was limited to no bending, squatting, twisting, or kneeling. (Tr. 280)

On December 28, 2011, in Plaintiff's first follow-up visit after her knee surgery, Dr. Edwards noted that Plaintiff needed therapy twice per week for two weeks, and that she did not require any pain medication. (Tr. 245)[3] During a follow-up appointment on January 17, 2012, Dr. Edwards noted that, "[o]verall she is doing very well." Plaintiff was continued on physical therapy, and allowed to return to work with restrictions of "no kneeling, squatting, or ladder climbing." (Tr. 246, 282)

Plaintiff returned to Dr. Edwards on January 30, 2012, after she "felt a pop." (Tr. 248) Plaintiff was given a corticosteroid (Depomedrol) injection and continued on therapy. Dr.

---

[3] The copy of Dr. Edwards' "Return to Work Record" for December 28, 2011, is of poor quality. (Tr. 281)

Edwards continued the work-related restrictions of no kneeling, squatting, twisting, or ladder climbing, and added a lifting restriction of not greater than five pounds. Dr. Edwards specifically instructed that Plaintiff should not lift mop buckets. (Tr. 248, 283)

Plaintiff's next follow-up visit with Dr. Edwards was on February 21, 2012. Dr. Edwards was concerned that Plaintiff's symptoms were greater than he would like to see at that point. (Tr. 250) As a result, Dr. Edwards administered another corticosteroid injection. Plaintiff's therapy was discontinued but her work restrictions were to remain in effect. Dr. Edwards began a course of treatment using Naprosyn (an NSAID anti-inflammatory drug). (Id.) During follow-up treatment on March 5, 2012, Dr. Edwards noted that Plaintiff continued to complain of symptoms "when she is up." Dr. Edwards continued Plaintiff's work restrictions, and returned her to physical therapy. (Tr. 251) Plaintiff returned to Dr. Edwards on March 26, 2012, still complaining of pain. (Tr. 252) Dr. Edwards discontinued therapy, continued Plaintiff's work-related restrictions, ordered another MRI, and ordered a brace. (Id.)

Plaintiff had another MRI of her left knee on April 11, 2012, and a follow-up visit with Dr. Edwards on April 23, 2012. (Tr. 254, 256) Dr. Edwards noted no evidence of any meniscal pathology but some evidence of fibrosis. (Tr. 224-25) As a result, Plaintiff elected to have Dr. Edwards perform an arthroscopic debridement procedure on her left knee. (Tr. 256) In the meantime, Plaintiff received pain medication and her work-related restrictions remained in place. (Tr. 256-67, 286-89)

On August 9, 2012, Dr. Edwards performed an arthroscopic "major debridement" procedure on Plaintiff's left knee. (Tr. 231-32, 268) During a follow-up visit on August 22, 2012, Plaintiff was "doing fairly well," but was "non weight bearing." Plaintiff was working on her range of motion and continued on the same work restrictions "as far a sedentary only." (Tr. 270, 290) During follow-up treatment on September 12, 2012, Dr. Edwards noted that Plaintiff

continued to "have some discomfort with extremes." (Tr. 272) Dr. Edwards recommended Plaintiff be "fairly aggressive" going forward with exercise therapy, with four weeks of therapy, three-to-five times per week. (Id.) Dr. Edwards continued Plaintiff's work-related restrictions, including limiting her to sedentary work. (Tr. 272, 291) During follow-up treatment on September 26, 2012, Dr. Edwards noted that Plaintiff was "getting some improvement" but she also continued to have difficulty and discomfort. Dr. Edwards continued Plaintiff's therapy and sedentary work-related restrictions. (Tr. 274, 292)

On November 6, 2012, Plaintiff returned to Dr. Edwards for a follow-up appointment. At that time, Dr. Edwards noted that Plaintiff was "[d]efinitely improving." Dr. Edwards limited Plaintiff's physical therapy to avoid exercises that cause pain. (Tr. 276) Dr. Edwards also indicated that he would like to return Plaintiff to work without restrictions, and see her again in six weeks. (Tr. 276, 293) Plaintiff was to wear a brace when she was "up and about." (Id.)

Plaintiff returned to Dr. Edwards on December 13, 2012. Plaintiff reported that she was doing better, but was having problems with therapy. (Tr. 277) Plaintiff indicated that she was not having problems at work. (Id.) Dr. Edwards discontinued physical therapy and placed "[n]o restrictions" on Plaintiff, requesting that she return in five weeks "to make sure that she continues to improve." (Id.) Dr. Edwards' Return to Work Record indicates that Plaintiff could return to work without restrictions. (Tr. 294)

On January 17, 2013, Plaintiff returned to Dr. Edwards for a follow-up visit. Plaintiff reported intermittent symptoms. (Tr. 278) Dr. Edwards' notes indicate that he found Plaintiff had reached "MMI," and noted that she was "at full duty without restrictions."[4] (Tr. 278, 295) Plaintiff was to take "an occasional anti inflammatory as well [as] migraine medicine for the

---

[4] Based on context, the undersigned construes Dr. Edwards' "MMI" notation to be an abbreviation for maximum medical improvement.

knee pain.  Otherwise I will see her back on an as needed basis." (Id.)

**B.      Pemiscot Memorial Hospital**

The administrative record before the Court indicates that Plaintiff received treatment at Pemiscot Memorial Hospital.  (Tr. 299-352)  On January 28, 2013, Dr. Jim Hazel examined Plaintiff relative to cervical spine pain.  The treatment notes indicate no significant abnormality.  (Tr. 299)  Most of the remaining notes from Pemiscot Memorial Hospital relate to Plaintiff's rehabilitation and physical therapy associated with her left knee pain and surgeries.  (See, e.g., 301-52)

**C.      Caruthersville Clinic – Dr. Douglas Fitzwater, M.D.**

Apart from her orthopedic treatment with Dr. Edwards, Plaintiff also received medical treatment from Dr. Douglas Fitzwater and his clinic.  (Tr. 355-65)  These visits generally concerned routine medical matters such as influenza and conjunctivitis.  (See, e.g., Tr. 357, 359)  On January 28 and 31, 2013, Plaintiff was seen by Dr. Fitzwater due to complaints of hip pain and an arm numbness problem.  (Tr. 361-65)  Plaintiff was treated with a limited course of medication without any further intervention noted.  (Tr. 364-65)

**D.      Southeast Missouri Health Network**

Plaintiff also received treatment from providers at Southeast Missouri Health Network – Portageville, Missouri.  (Tr. 365-80)  Plaintiff was seen for a variety of ailments and conditions, including ankle pain, wrist issues, sinus problems, left arm numbness, congestion, adjustment disorder, and back pain.  Plaintiff routinely received conservative treatment, such as a short term course of medication.  (Id.)

**E.      Mid-America Rehab, P.C. – Vic Zuccarello**

The administrative record includes documents from Mid-America Rehab, P.C.  (Tr. 381-412)  These records include notes and forms associated with a Functional Capacity Evaluation

("FCE") completed by Occupational Therapist Vic Zuccarello, dated June 20, 2013, upon

referral from Dr. Edwards. In her identification information, Plaintiff indicated that, although

she had been laid off, she was looking for another job. (Tr. 412) The records also indicate that

Plaintiff provided a great deal of background information in connection with Mr. Zuccarello's

FCE. Plaintiff rated her pain in seven areas of life, and described her pain primarily in

connection with her left knee.

> Mr. Zuccarello concluded that Plaintiff had the following demonstrated impairments:
>
> Mild decrease in terminal L knee flexion ROM. Moderately decreased L quad strength. Mildly antalgic gait pattern consistent with guarding of LLE in climbing and lower level postures. Decreased L calf girth. She does have valid dysfunction but seems to have adapted to the changes it imposes on her current functional ability.

(Tr. 396)

After conducting what appears to be a thorough evaluation, Mr. Zuccarello concluded

that Plaintiff "display[ed] no overt functional limiting factors that would prohibit work in her

prior job. She had been working full duty up to the time of lay-off and would likely still be

working in that job despite some residual discomfort. She is looking for a job in the same

occupation presently." (Tr. 396) Mr. Zuccarello opined that, based on his evaluation, Plaintiff

could –

> function on a full-time basis in the MEDIUM work demand level as follows:
> 1. Material Handling: no limitations per the employer job description.
> 2. Non-Material Handling: no limitations per the employer job description.
> 3. All findings were discussed with the work after the FCE.
> These guidelines meet full duty requirements.

(Id.)

### F.  Orthopedic Consultant Services – Dr. Dwight Woiteshek, M.D.

Dr. Dwight Woiteshek, M.D., conducted an independent medical evaluation of Plaintiff

in April 2013.  (Tr. 414-20)  Dr. Woiteshek submitted a letter, dated April 10, 2013, which documented his evaluation.  Dr. Woiteshek reviewed Plaintiff's medical history and conducted a physical examination of Plaintiff.  Plaintiff complained of "pain, stiffness, and weakness of her left knee area."  (Tr. 416)

Dr. Woiteshek opined that Plaintiff had "not reached maximum medical improvement" for her knee injury, and that there remained "a reasonable probability that [Plaintiff] will require additional medical treatment related to [her knee injury] to give her comfort or relief if a cure is beyond avail.  This additional medical treatment will include but not be limited to continued medication, physical therapy, pain management, and left total knee surgery."  (Tr. 418)  Dr. Woiteshek further opined that, if Plaintiff did not receive the additional medical treatment, Plaintiff would be hindered in her ability to become reemployed as follows:

> There is a 40% permanent partial disability of the lower extremity rated at the knee level (160 weeks) due to the traumatic internal derangement of the left knee s/p surgery on 12/15/11 by Dr. Edwards, the subsequent postoperative arthrofibrosis seen on the MRI scan taken on 4/11/12 s/p a second surgery on 8/9/12 by Dr. Edwards, and the subsequent posttraumatic osteoarthritis reasonably confirmed.  The rating accounts for ongoing discomfort, stiffness, and weakness in the left knee area.

(Tr. 419)

Dr. Woiteshek noted the following permanent work-related restrictions for Plaintiff:

> 1)    She is advised to avoid repetitive stooping, squatting, crawling, kneeling, and all impact maneuvers.
> 2)    She should be cautious navigating steps on uneven surfaces and ladders, especially if she must handle weight.
> 3)    She should continue strengthening, stretching, and range of motion exercises daily.
> 4)    She should walk, bike, or swim to tolerance daily for exercises.
> 5)    She should consider glucosamine as a useful supplement to maintain articular surface cartilage.
> 6)    If she must be on her knees for any reason, she should have pads on the surface of her knees.
> 7)    She should limit prolonged weight-bearing including standing and walking to tolerance.

III. **Administrative Hearing**

On April 22, 2014, the ALJ conducted a hearing on Plaintiff's disability application. (Tr. 29-46) Plaintiff, who appeared with counsel, testified in response to questions posed by the ALJ and counsel. Plaintiff was 51 years old at the time of the hearing. Among other things, Plaintiff testified that she completed the twelfth grade, has never married, and was living with her boyfriend. Plaintiff's boyfriend and one of her two daughters help Plaintiff around the house. Plaintiff explained that she became disabled as a result of a knee injury she sustained in September 2011. Plaintiff represented that she continued to earn income after the injury because she was paid to "come out to [her] workplace and sit in the cafeteria and sit there and look at four walls, … eight hours a day." (Tr. 35) Plaintiff explained that she was eventually laid off on January 3, 2013.

Plaintiff described the limitations and pain she experienced as a result of her knee problems. Plaintiff represented that she could no longer work because of knee pain.[5] Plaintiff explained that, although she has already had two knee surgeries, she will eventually need a complete knee replacement. Plaintiff further explained that she is on pain medication, muscle relaxers, and anti-depression medication. She also described stomach, sinus, and allergy issues. Plaintiff indicated that she had no side effects from her medications, and although they do not relieve all of her symptoms, they allow her to get more rest.

In addition to knee issues, Plaintiff testified that her left ankle also hinders her activities. According to Plaintiff's testimony, sometimes she feels like a bone snapped in her ankle, and she

---

[5] For example, Plaintiff testified that, "if I'm on my leg for more than 30 minutes or actually 15 minutes, after 15 minutes I start … having pain in the knee. After about 30 [minutes] it gets so bad I have to sit down for about 30 minutes." (Tr. 35)

cannot walk for a couple of days.  Plaintiff explained that her doctor told her to take a vitamin D supplement to address her ankle problem.

Regarding her activities, Plaintiff testified that she was able to drive; she drove herself to the hearing and drives herself to her medical appointments.  Plaintiff explained that she cannot do housework because she cannot get down on her knees or reach up.  Plaintiff could shop for groceries "and things like that," and attend to minor cooking (e.g., "a hamburger or something like that") but not a big meal.  (Tr. 38)  Plaintiff was also able to do her own laundry.  Plaintiff visits her mother in a nursing home twice weekly.  Plaintiff's daughter assists her with many other household tasks.   Her boyfriend mows her lawn.

In addition to pain in her left knee, Plaintiff also experiences swelling.  To relieve her symptoms, Plaintiff uses a recliner to elevate her foot and an ice machine.

Vocational Expert ("VE") Janice Hastert testified in response to questions posed by the ALJ.  The ALJ asked the VE to consider a hypothetical worker, with the same background as Plaintiff, who retained the residual functional capacity ("RFC") to occasionally lift 20 pounds; frequently ten pounds; walk or stand six hours out of an eight hour day for 30 minutes at a time; and sit for six hours out of eight hours.  The hypothetical worker could occasionally climb stairs, but should never climb ropes, scaffolds or ladders; she could never kneel, crouch or crawl; and she would be limited to no pushing and pulling with the left lower extremity.

The VE opined that this hypothetical worker could not return to Plaintiff's past relevant work, but would retain the RFC to perform other jobs that existed in substantial numbers in the national or regional economy, within the light, unskilled category, including officer helper, shipping/receiving weigher, and photo copy machine operator.

## IV.  **ALJ's Decision**

This is a DIB case.  Plaintiff alleged a disability onset date of September 30, 2011.  Based

on Plaintiff's past earnings history, the ALJ determined that Plaintiff met the insured status through December 31, 2017.  (Tr. 16, 18)

In assessing whether Plaintiff was disabled, the ALJ followed the required five-step process laid out in the Commissioner's regulations.  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity after her alleged onset of disability.  (Tr. 18)  At step two, the ALJ found that Plaintiff had the following severe impairment:  "status post left knee arthroscopy and subsequent debridement."  (Id.)  The ALJ also found that Plaintiff had the following non-severe impairments:  rhinitis, and adjustment disorder.  (Tr. 18-19)  Regarding Plaintiff's adjustment disorder, the ALJ indicated that the condition had been treated by Plaintiff's primary care physician with Cymbalta, and that Plaintiff did not require any specialized mental health treatment.  (Tr. 19)  Additionally, the ALJ considered the four broad functional areas associated with evaluating mental disorders and found that Plaintiff's mental impairment caused not more than mild limitations, and she had experienced no episodes of decompensation.  (Id.)  The ALJ also noted that there were references in the record to left arm numbness and left ankle pain, but there were no "corresponding medical diagnoses from an acceptable medical source."  (Tr. 19)  Accordingly, the ALJ concluded that these latter conditions were not "medically determinable impairments."  (Tr. 20)  The ALJ noted, however, that all impairments, severe and non-severe, were "taken into account in assessing [Plaintiff's] residual functional capacity."  (Id.)

At step three, the ALJ found that none of Plaintiff's impairments, alone or in combination, met or equaled a listed impairment.  The ALJ expressly considered and rejected Listing 1.02 (major dysfunction of a joint).  (Tr. 20)[6]

---

[6] In her brief to this Court, Plaintiff does not contend that the ALJ erred in this regard at step three.

At step four, the ALJ concluded that Plaintiff had the RFC to –

> perform light work as defined in 20 CFR 404.1567(b), in that, she can lift and
> carry 20 pounds occasionally and 10 pounds frequently, walk or stand 6 hours out
> of an 8 hour work day and sit for 6 hours out of an 8 hour work day, except she
> may occasionally climb stairs but should never climb ropes, scaffolds or ladders.
> She should never crouch, kneel or crawl. She should never push or pull with the
> lower left extremity.

(Tr. 20)

In making this RFC determination, the ALJ also made an adverse determination regarding Plaintiff's credibility. In particular, the ALJ concluded that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [were] not entirely credible …." (Tr. 21)

The ALJ considered the opinions of Plaintiff's orthopedic surgeon, Dr. Edwards, which are discussed above. (Tr. 22) The ALJ gave significant weight to Dr. Edwards' September 2012 opinion, wherein he released Plaintiff back to work, but restricted her to sedentary activities. (Id.) The ALJ also gave significant weight to Dr. Edwards' November 2012 opinion, wherein he released Plaintiff to work without any further limitations. (Id.)

The ALJ also considered the records associated with the June 2013 functional capacity evaluation completed at Mid-America Rehab. The ALJ gave significant weight to the conclusion that Plaintiff had "demonstrated physical tolerances [that] placed her within the range of medium exertion work, which was compatible with her past work." (Tr. 22) The ALJ noted that the weight given to the opinion was "reduced somewhat in deference to [Plaintiff's] subjective complaints." (Id.)

The ALJ also specifically considered the independent medical examination conducted by Dr. Woiteshek, of Orthopedic Consultant Services. (Tr. 22-23) The ALJ gave only "little weight" to Dr. Woiteshek's disability rating in which he opined that Plaintiff had a "40 percent

permanent partial disability of the lower left extremity," caused by Plaintiff's September 2011 knee injury. (Tr. 23) The ALJ gave "some weight" to the functional limitations found by Dr. Woiteshek,[7] in that these restrictions were consistent with the RFC identified by the ALJ. (Id.)

As a result of his RFC determination, and with the assistance of testimony from the VE, the ALJ concluded that Plaintiff could not perform the duties of her past relevant work. (Tr. 24)

At step five, the ALJ relied on the VE's testimony to support a conclusion that there existed sufficient jobs in the national economy that Plaintiff could still perform, such as office helper, shipping/receiving weigher, and photocopy machine operator. (Tr. 24-25) Accordingly, the ALJ found that Plaintiff was not disabled under the Act. (Tr. 25)

**Analysis**

## I.    <u>Issues Presented for Review</u>

Plaintiff raises two separate issues for review. First, Plaintiff contends that the ALJ erred in assessing her RFC. Plaintiff argues that the ALJ gave significant weight to three different opinions without resolving inconsistencies within those opinions. Plaintiff also contends that the ALJ failed to provide a sufficient narrative explanation as to how the evidence supported a conclusion that Plaintiff could perform light work. Accordingly, Plaintiff contends that the RFC is not supported by substantial evidence. Second, Plaintiff contends that the ALJ's adverse credibility determination was flawed. According to Plaintiff, apart from Plaintiff's activities of daily living, the ALJ failed to explain what inconsistencies or discrepancies were relied upon in discrediting Plaintiff's subjective complaints. Additionally, Plaintiff contends that the ALJ should have taken into account Plaintiff's strong work history.

---

[7] The ALJ summarized the consultant's statement of Plaintiff's functional limitations as follows: (1) Plaintiff "should avoid repetitive stooping, squatting, crawling and kneeling;" (2) she "should be cautious with stairs, uneven surfaces or ladders;" and (3) she "should limit prolonged weight-bearing through standing or walking." (Tr. 23)

The Commissioner has filed a brief in opposition, refuting Plaintiff's allegations of error.

## II.  Standard of Review and Analytical Framework

To be eligible for DIB benefits, a claimant must prove that she is disabled within the meaning of the Act.  See Baker v. Sec'y of Health and Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  Under the Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A).  A claimant will be found to have a disability "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A) and 1382c(a)(3)(B).  See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

Per regulations promulgated by the Commissioner, the ALJ follows a five-step process in determining whether a claimant is disabled.  "During this process the ALJ must determine: '1) whether the claimant is currently employed; 2) whether the claimant is severely impaired; 3) whether the impairment is, or is comparable to, a listed impairment; 4) whether the claimant can perform past relevant work; and if not 5) whether the claimant can perform any other kind of work.'"  Andrews v. Colvin, 791 F.3d 923, 928 (8th Cir. 2015) (quoting Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006)).  "If, at any point in the five-step process the claimant fails to meet the criteria, the claimant is determined not to be disabled and the process ends."  Id. (citing Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005)); see also Martise v. Astrue, 641 F.3d 909, 921 (8th Cir. 2011).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)). The ALJ's findings should be affirmed if they are supported by "substantial evidence" on the record as a whole. See Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008). Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Reece v. Colvin, -- F.3d --, 2016 WL 4446109 at *3 (8th Cir. Aug. 24, 2016); Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010).

Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The district court must "also take into account whatever in the record fairly detracts from that decision." Id. Specifically, in reviewing the Commissioner's decision, a district court is required to examine the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The claimant's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the claimant's impairments.

6. The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (citation omitted).

Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also Chaney v. Colvin, 812 F.3d 672, 676 (8th Cir. 2016); McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## III. Analysis of Issues Presented

### A. Credibility

The Court first addresses the ALJ's adverse credibility determination, as that decision impacted the RFC the ALJ assigned to Plaintiff. See Wildman, 596 F.3d at 969 (explaining that an "ALJ's determination regarding [a claimant's] RFC was influenced by [the ALJ's] determination that [claimant's] allegations were not credible") (citing Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005)).

"An ALJ has a 'statutory duty' to 'assess the credibility of the claimant,' and thus, 'an ALJ may disbelieve a claimant's subjective reports of pain because of inherent inconsistencies or other circumstances.'" Crawford v. Colvin, 809 F.3d 404, 410 (8th Cir. 2015) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 589-90 (8th Cir. 2004)). Moreover, the Eighth Circuit has instructed that, in the course of making an RFC determination, the ALJ is to consider the credibility of a plaintiff's subjective complaints in light of the factors set forth in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). See also 20 C.F.R. §§ 404.1529, 416.929. The factors identified in Polaski include:

(i) claimant's daily activities; (ii) the duration, frequency, and intensity of

claimant's pain; (iii) precipitating and aggravating factors; (iv) the dosage, effectiveness, and side effects of medication; and (v) the claimant's functional restrictions.

Julin v. Colvin, 826 F.3d 1082, 1086 (8th Cir. 2016) (citing Polaski, 739 F.2d at 1322; 20 C.F.R.

§ 416.929(c)).

An ALJ is not required to discuss each Polaski factor and how it relates to a plaintiff's credibility. See Partee v. Astrue, 638 F.3d at 860, 865 (8th Cir. 2011) (stating that "[t]he ALJ is not required to discuss methodically each Polaski consideration, so long as he acknowledged and examined those considerations before discounting a [plaintiff's] subjective complaints") (internal quotation and citation omitted); Samons v. Astrue, 497 F.3d 813, 820 (8th Cir. 2007) (stating that "we have not required the ALJ's decision to include a discussion of how every Polaski factor relates to the [plaintiff's] credibility").

This Court reviews the ALJ's credibility determination with deference and may not substitute its own judgment for that of the ALJ. "The ALJ is in a better position to evaluate credibility, and therefore we defer to [the ALJ's] determinations as they are supported by sufficient reasons and substantial evidence on the record as a whole." Andrews, 791 F.3d at 929 (citing Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006)). See also Julin, 826 F.3d at 1086 (explaining that "[c]redibility determinations are the province of the ALJ" and the deference federal courts owe to such determinations); Gregg v. Barnhart, 354 F.3d 710, 713 (8th Cir. 2003) (holding that "[i]f an ALJ explicitly discredits the [plaintiff's] testimony and gives good reasons for doing so, [the reviewing court] will normally defer to the ALJ's credibility determination"). In this case, despite Plaintiff's arguments to the contrary, the ALJ gave good reasons for discounting Plaintiff's credibility. Accordingly, the Court will defer to the ALJ in this regard.

Plaintiff's brief suggests that the ALJ discounted her credibility on the basis of her activities of daily living, and failed to explain how any other evidence detracted from her

credibility.[8]  This is not correct.  The ALJ considered the evidence, including the opinion evidence, in both assessing Plaintiff's credibility and identifying her RFC.

A brief review of the ALJ's decision and relevant evidence is sufficient to demonstrate that the ALJ's credibility determination was not only adequately explained, but also supported by substantial evidence in the record as a whole.  For example, the ALJ noted that, after her second surgery to clean up her knee, Plaintiff received relatively conservative treatment for her symptoms.  See Milam v. Colvin, 794 F.3d 978, 985 (8th Cir. 2015); cf. Buford v. Colvin, 824 F.3d 793, 797 (8th Cir. 2016); Lawson v. Colvin, 807 F.3d 962, 965 (8th Cir. 2015).  In this regard, the ALJ considered the November 2012 opinion of Plaintiff's orthopedic surgeon, Dr. Edwards, who released Plaintiff back to work without restrictions.  The ALJ explained that Dr. Edwards' opinion was "consistent with the contemporaneous medical evidence …."  (Tr. 22)  The ALJ further explained that, as of January 2013, although Plaintiff's knee had reached its maximum, medical improvement, and Plaintiff still had "complaints of intermittent symptoms.  She addressed those symptoms by using occasional anti-inflammatory medication."  According to the ALJ, "[t]hat admission ... belies her allegations of disability because disabling pain would require much more than [such] intermittent treatment."  (Id.)

As another example, the ALJ stated the following regarding a June 2013 functional capacity evaluation:

> [Plaintiff] reported her left-knee pain to range from 3/10 to 6/10 when performing a broad range of activities of daily living and work-related activities.  On that scale, 10/10 was described as completely disabled.  [Plaintiff] reported her pain in the last month had reached 7/10 only, at its worst.  This admission, when viewed in context of the pain scale, directly contradicts her allegations of disability and weighs negatively against her credibility.

---

[8] Plaintiff avers that, "[w]hile the ALJ did discuss Herren's activities of daily living, after that discussion, the ALJ provided a summary of the evidence but failed to subsequently explain how such information damaged Herren's credibility."  (ECF No. 16 at 14)

(Tr. 22, emphasis supplied)  Similarly, the ALJ accurately noted that functional testing placed Plaintiff's physical tolerances "within the range of medium exertion work."  (Tr. 22, 396)

As Plaintiff acknowledges, the ALJ concluded that Plaintiff's daily activities, while not conclusive proof of an ability to work, were "not limited to the extent one would expect given [Plaintiff's] complaints of disabling symptoms and limitations."  (Tr. 21)  This was a proper consideration relative to Plaintiff's credibility.  See Perks v. Astrue, 687 F.3d 1086, 1093 (8th Cir. 2012) (noting that the claimant's normal activities were inconsistent with complaints of disabling pain) (citing Medhaug v. Astrue, 578 F.3d 805, 817 (8th Cir. 2009)).  See also McDade v. Astrue, 720 F.3d 994, 998 (8th Cir. 2013) (citing Perks).

Finally, while the record supports a conclusion that Plaintiff had a good work history prior to her knee injury, the fact that the ALJ did not specifically mention that history in making his credibility determination is not fatal to the decision.  An ALJ may still discount a claimant's credibility despite a good work history.  See Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007); see also Hepp v. Astrue, 511 F.3d 798, 806 (8th Cir. 2008); Partee, 638 F.3d at 865 (explaining that an ALJ is not required to discuss each Polaski factor); Samons, 497 F.3d at 820 (same).  Any failure to more thoroughly discuss Plaintiff's work history amounts to, at most, an "arguable deficiency in opinion-writing technique," that would not require this Court to reverse the ALJ's decision in this matter.  Hepp, 511 F.3d at 806.

In summary, the ALJ gave good reasons for discounting Plaintiff's subjective complaints.  Thus, the ALJ's decision in this regard will not be disturbed.[9]  See Julin, 826 F.3d at 1086

---

[9] Perhaps it is worth noting that the ALJ did not completely discredit Plaintiff's subjective complaints.  In fact, the ALJ credited her subjective complaints in limiting her to light work, rather than a more strenuous level.  For example, although the ALJ gave significant weight to Dr. Edward's November 2012 conclusion that Plaintiff could return to work without restrictions, he included additional limitations in Plaintiff's RFC "in deference to [her] subjective complaints."  (Tr. 22)  Similarly, although Plaintiff's physical tolerances arguable place her

(noting the deference due to an ALJ's credibility determination); Gregg, 354 F.3d at 713.

**B.    RFC and Opinion Evidence**

Plaintiff contends that the ALJ's RFC is not supported by substantial evidence because the ALJ failed to resolved inconsistencies in the evidence, and failed to provide a sufficient narrative discussion regarding how the evidence supports the ALJ's conclusion that Plaintiff could perform light work.  Plaintiff contends, in substance, that the ALJ's finding that Plaintiff was capable of performing light work, albeit with additional restrictions, was inconsistent with the fact that the ALJ gave significant weight to Dr. Edwards' opinion that, as of September 2012, Plaintiff was limited to only sedentary work.  (ECF No. 16 at 11-12)  Again, Defendant takes issue with Plaintiff's characterization of the ALJ's decision.

A claimant's RFC is the most that claimant can do despite her limitations.  See 20 C.F.R. § 404.1545(a)(1).  In determining a claimant's RFC, the ALJ should consider "all the evidence in the record, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations."  Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (internal quotations omitted).  While the RFC determination occurs at step four, where the claimant has the burden of proof, the Eighth Circuit has explained that the ALJ has primary responsibility for determining the RFC.  Id.

Substantial evidence supports the ALJ's consideration of the various source opinions, as well as his determination of Plaintiff's RFC.  Plaintiff's argument rests on an incomplete recitation of the record and the ALJ's decision.  Plaintiff is correct in noting that the ALJ gave "significant weight" to the September 2012 opinion of Dr. Edwards that Plaintiff was restricted to a sedentary level of activity.  But that was Dr. Edwards' opinion during a snapshot in time—

---

within the medium exertion level, the ALJ gave some deference to her subjective complaints in limiting her to light work.  (Id.)

shortly after he performed debridement surgery on Plaintiff's knee. (Tr. 22, 274) What Plaintiff does not fully consider is that Dr. Edwards' opinion regarding Plaintiff's limitations changed over the next couple of months, as Plaintiff's condition improved following surgery. As such, the ALJ also gave significant weight to Dr. Edwards' November 2012 opinion in which he concluded that Plaintiff could return to work without restrictions. (Tr. 22, 276) In fact, during later follow-up visits, Dr. Edwards continued to report that Plaintiff could return to work without restrictions. (Tr. 277, 278)[10]

It must be remembered that Dr. Edwards was Plaintiff's treating orthopedic surgeon. Arguably, the ALJ could have granted controlling weight to Dr. Edwards' opinion that Plaintiff was capable of returning to work without any restrictions. See Reece, 2016 WL 44446109 at *3. The ALJ, however, gave Plaintiff some benefit of the doubt regarding her subjective complaints. As such, the ALJ concluded that Plaintiff was capable of only light work, with the additional limitations noted in the RFC.[11]

Finally, when Dr. Edwards' opinions are considered in their entirety and full context, the remainder of Plaintiff's argument regarding an alleged failure to harmonize the various opinions unwinds. The ALJ's decision adequately and fairly discharges his duty of resolving the various opinions. See Finch, 547 F.3d at 936 ("The ALJ is charged with the responsibility of resolving conflicts among medical opinions."). Further, the ALJ gave sufficient and good reasons for weighing the evidence as he did. See Reece, -- F.3d at --, 2016 WL 44446109 at *3 (citing

---

[10] Dr. Edwards' January 17, 2013 notes indicate that Plaintiff "is at full duty without restrictions," and that she could take "an occasional anti inflammatory as well [as] migraine medication for the knee pain. Otherwise I will see her back on an as needed basis." (Tr. 278, emphasis supplied)

[11] Plaintiff has not articulated any specific and meaningful errors regarding the additional limitations in Plaintiff's RFC. Accordingly, the undersigned will not address those limitations further herein.

Hamilton v. Astrue, 518 F.3d 607, 610 (8th Cir. 2008); 20 C.F.R. § 404.1527(d)(2)).

In addition to Dr. Edwards' opinions, the ALJ considered records from the 2013 functional capacity evaluation at Mid-America Rehab, and the opinions of Dr. Woiteshek, a consulting physician.

The results of a functional capacity evaluation placed Plaintiff within the range of medium-level work.[12] The ALJ gave that conclusion significant weight. While it is true that medium-level is work more restrictive than Dr. Edwards' latter opinions (which placed no restrictions on Plaintiff), it was less restrictive than the light-level ultimately assigned to Plaintiff's RFC. Thus, to the extent there is an unexplained conflict between opinions, the ALJ resolved that conflict in Plaintiff's favor by limiting Plaintiff to light work. Therefore, any error in this regard would be harmless. See Hepp, 511 F.3d at 806.

Turning next to Dr. Woiteshek, the fact that he found Plaintiff to have a "40 percent permanent partial disability" is not particularly relevant. The ALJ was justified in not crediting that opinion at all to the extent it impinged upon the province of the Commissioner. See Perkins v. Astrue, 648 F.3d 892, 898 (8th Cir. 2011); House v. Astrue, 400 F.3d 741, 745 (8th Cir. 2007) (citing Krogmeier, 294 F.3d at 1023). Additionally, Dr. Woiteshek's opinion was specifically premised on the fact that Plaintiff's condition would likely improve with additional treatment. (Tr. 418) Dr. Woiteshek's opinions applied only if Plaintiff did not receive the additional treatment. (Tr. 419)

The ALJ gave ultimately "some weight" to the functional limitations found by Dr. Woiteshek. (Tr. 22-23) In particular, the ALJ credited Dr. Woiteshek to the extent the

_____

[12] As noted above, the occupational therapists concluded that Plaintiff "display[ed] no overt functional limiting factors that would prohibit work in her prior job," and that Plaintiff could function on a full-time basis at the medium work demand level. (Tr. 396)

limitations were consistent with the RFC the ALJ identified. Given the fact that the ALJ gave significant weight to Dr. Edwards' opinion that Plaintiff could work without restrictions, there is nothing inherently inconsistent with the ALJ's weighing of Dr. Woiteshek's opinion regarding Plaintiff's functional limitations.

In summary, the ALJ properly considered and weighed the relevant medical source opinions. Plaintiff's arguments in this regard can only succeed if one completely ignores Dr. Edwards' latter opinion that Plaintiff could return to work without restriction. The ALJ, however, expressly and properly considered that opinion in determining Plaintiff's RFC. Although the ALJ ultimate found Plaintiff to be <u>more</u> restricted than did Dr. Edwards, that difference did not operate to Plaintiff's material detriment.

For the foregoing reasons, Plaintiff's contention that the ALJ erred in formulating her RFC cannot be sustained. The ALJ's decision regarding Plaintiff's RFC is supported by substantial evidence, and because that decision falls within the reasonable "zone of choice," it will not be disturbed. <u>See</u> <u>Buckner</u>, 646 F.3d at 556.

### Conclusion

Accordingly,

**IT IS HEREBY ORDERED** that, the decision of the Commissioner is **AFFIRMED**. A separate Judgment shall be entered this day.

 /s/ ***John M. Bodenhausen***
JOHN M. BODENHAUSEN
United States Magistrate Judge

Dated this  5th  day of   October  , 2016.